**Opinion issued December 15, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00967-CR

————————————

**HUVER OREGON-REYES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 434th District Court
Fort Bend County, Texas
Trial Court Case No. 14-DCR-065800**

---

## MEMORANDUM OPINION

A jury convicted Huver Oregon-Reyes of murder, and the trial court sentenced him to 45 years' confinement. Huver appeals and argues, in two issues, that the evidence was insufficient to support his conviction and that the trial court improperly denied his motion to suppress his confession to police. We affirm.

## Background

The decedent, Marlon Alexander Palencia "Alex" Castaneda, sent messages on Facebook to Araceli Romero, Huver's wife. Huver asked Araceli to "defriend" Alex on Facebook, which she did. Araceli and Alex had no communications for at least a year before Alex's death. Huver, however, believed that Araceli had engaged in an affair with Alex and warned his wife that he would find Alex and make him "pay for the fact that he got involved with" her.

On March 20, 2014, Huver went out drinking with a friend, Daniel Castaneda-Gomez. Huver told Daniel that he was going to go to Sugar Land "to kill [a] guy." Daniel was also upset at Alex because the latter had been sending Facebook messages to Daniel's girlfriend. Daniel agreed to go to Sugar Land with Huver. The following morning, Daniel used Facebook to locate Alex. Huver drove his wife's gold-colored Acura SUV to Alex's workplace, accompanied by Daniel.

At approximately 9:00 a.m. on March 21, 2014, Huver and Daniel arrived at Global Casework, where Alex worked. They walked into the work area, where they encountered Luis Caballeros, a Global Casework employee, and asked for Alex. Luis directed them to Alex's work area.

Global Casework's internal security video system recorded events from a variety of angles. The videos show two men entering the business's work area and approaching Alex's work station. One man, Huver, is seen wearing a dark shirt,

2

and the other man, whom Huver later identified as Daniel, is seen wearing an orange shirt. The videos show the men fleeing the warehouse a moment later, as well as Alex clutching his chest, stumbling, and falling to the floor. A surveillance video from a business across the street shows the same two men running, then driving away in a gold-colored SUV.

Obed Caballeros worked near Alex's work station and was the closest witness to the shooting. Obed testified that he saw two young men walk into the work area and speak with Alex, then saw Alex try to move the men to the side. He saw Alex attempt to turn away from the men, then saw one of the men pull out a gun and shoot Alex as Alex was turning. He described the shooter as a man wearing a blue shirt and an earring. After the shooting, he saw the men run away, while Alex stumbled toward him.

Another witness and Global Casework employee, Israel Pena, testified that he heard a popping sound, went to the factory floor, and found Alex lying on the ground and bleeding. Pena attempted first aid, but Alex died in his arms within a few minutes.

The morning of the shooting, Huver called his wife, Araceli, and told her that he had shot someone. Araceli did not believe him, told him he was crazy, and hung up the phone. Later in the day, however, she saw surveillance videos of the shooting on television and recognized her husband. She called "Crime Stoppers"

3

and made an anonymous tip. She later spoke with police and gave them additional information that facilitated Huver's arrest. Huver was arrested in Denton County, north of the Dallas–Fort Worth area. He had cut his hair, changed the SIM card in his cell phone, and stayed with family in various locations outside of the Houston area.

Police went to Huver's home and seized the gold Acura SUV, as well as shell casings and ammunition that matched the caliber of bullet used in the murder. They also found an orange shirt apparently matching the shirt that Daniel wore on the morning of the shooting.

Police interviewed Huver with the assistance of a detective who translated the interview.[1] Before doing so, they advised him of his rights under the United States Constitution and Texas law, including those required by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). Huver acknowledged each of his rights and stated that he understood each of them through a series of questions and answers. He and the detectives then had the following exchange:

Det. R. Garza: You can also waive your rights to remain silent and your right to request an—an attorney and you can proceed to answer any question or make any comment as you wish. If you decide to answer the

---

[1] The interview, including the questions and answers regarding Huver's rights, was conducted by Detective K. Gless and Detective R. Garza. Gless asked questions in English, and Garza translated Gless's questions from English into Spanish and Huver's answers from Spanish into English. Garza also asked additional questions in Spanish.

questions, you can stop whenever you want and claim your right to request—request an attorney, do you understand?

Huver: Yes.

Det. R. Garza: Uh, do you understand what I have said to you?

Huver: Yes.

Det. R. Garza: All of it? Okay. Knowing all these rights, do you want to talk to us about what happened here?

Huver: Is it necessary?

Det. R. Garza: Well, yes, yes. Well, we are—we are continuing an investigation and—and we want—He—he—he's asking if it's necessary for us to—to talk to him.

Det. K. Gless: For—well I—I need to talk to him and get his side of the story.

Det. R. Garza: He says—he says that we need to talk to you to get the side of your story.

Huver: Okay.

Det. R. Garza: Okay?

Huver: Yes.

Det. R. Garza: Yes. Okay. Yes, he said yeah.

Huver: But an attorney—I don't have any money to pay for an attorney.

Det. R. Garza: Okay. Okay. But—but you understand that you can talk to us without any attorney, right? Do you understand that?

Huver: Yes.

| | |
|---|---|
| Det. R. Garza: | Okay. And—and if you ever—ever—you decide "I want"—do you want—what you said is that you do want to talk to us, right? Okay. And if you ever—He's—he's asked—he just—he said that, uh, he doesn't—he can't—he can't pay for, uh, an attorney. Okay. So—so what'd ya want me to tell him? |
| Det. K. Gless: | That—the question is does he want to talk to us or does he wanna. . . [elipsis original] |
| Det. R. Garza: | He—he—okay. He says that the question is—is if you want to talk to us. |
| Huver: | Yes. |

Huver then confessed to the murder, explaining that he hadn't killed Alex earlier because he "hadn't run into him." When the detectives asked if he felt "bad for killing this guy," he answered, "Well, no." Once in jail, Huver had multiple phone conversations on the jail phone system with his wife, which were recorded and introduced at trial. In those recordings, he stated that he "felt humiliated" by Alex and told his wife not to "waste money" on an attorney, explaining, "I did what I did."

As trial approached, however, Huver apparently changed his mind about his defense. He wrote to Araceli from jail, asking her to testify that she "had something to do with" Alex, so that he could argue that the murder was "passional [sic] death." Araceli testified that she understood this to be a request that she lie under oath.

6

At trial, the jury heard testimony from Global Casework employees Pena, Luis, and Obed, who testified as to the events of the shooting. Obed identified Huver as one of the men who came into Global Casework looking for Alex and testified that he had previously identified Daniel in a photo line-up.

Araceli testified that Huver called her on the morning of the shooting and "told [her] that he had killed someone." She "told him [he was] crazy and . . . hung up on him," only to see him in a televised replay of Global Casework's security video later in the day. She called Crime Stoppers and later talked to the police. She also testified that Huver was drunk the night before the shooting, returned to their home with Daniel, and drove her car the morning of the shooting. She explained her relationship with Alex, testifying that she met him by chance on a trip to a store and agreed to be friends with him on Facebook, after which he would pay her compliments when she posted photos on the site. She became "friends" with him on Facebook about a year before his death and remained friends with him for two or three months, then broke off the connection at Huver's request. Huver, however, threatened "whenever he drank . . . that he was going to find" Alex and that Alex was "going to pay for the fact that he got involved with" Araceli.

The deputy medical examiner, Dr. H. Narula, testified that he conducted an autopsy of Alex and determined that the cause of his death was a gunshot wound to the chest. The wound was consistent with someone "turning away from a gunshot."

7

Kris Mancha, an employee of the business across the street that recorded footage of Huver and Daniel fleeing the scene, authenticated the video. D. Mancilla, a contractor working with the Fort Bend County Jail, authenticated the audio recordings of phone calls to Araceli by Huver from the jail and explained the technology used to confirm an inmate's identity when he uses the phone.

The State also presented testimony from a firearms examiner, who testified that the bullet that killed Alex was a 9-millimeter Luger round, a caliber consistent with ammunition that police recovered from Huver's home. Sergeant G. O'Donnell of the Sugar Land Police Department testified that he responded to the scene of the crime and authenticated various pieces of evidence. M. Hunter, an investigator with the Sugar Land Police Department, testified that he assisted with the investigation of Huver's apartment and located 9-millimeter ammunition there.

Huver moved to suppress his videotaped confession to police, and the trial court held a hearing on that motion. During that hearing, Detective R. Garza of the Sugar Land Police Department testified that he and Detective K. Gless took custody of Huver in Denton County and drove him to Sugar Land, but they did not interrogate him during that time. He further testified that, after they reached Sugar Land, he read Huver his *Miranda* rights using a card containing the text in Spanish. He also served as a translator during the interview, which he and Detective Gless conducted together. A licensed court interpreter also testified during the hearing

8

regarding the translation and interpretation of Huver's question, "Is it necessary?", and the detectives' responses. The trial court denied the motion to suppress and subsequently filed findings of fact and conclusions of law supporting its decision. Detective Garza testified in the presence of the jury regarding the confession, and the jury saw the video recording of the confession.

Huver testified in his own defense. He testified that he and Daniel "drank all night long" the night before the shooting, then went to Sugar Land to "beat [Alex] up." He had a gun with him and took it into Global Casework's facility, where he asked someone where to find Alex. He testified that he pointed the gun at Alex in an attempt to convince Alex to go outside, but did not intend to shoot Alex. According to Huver, he pulled back on the hammer of the gun, but the hammer slipped, causing the gun to fire, and he fled.

The jury convicted Huver of murder. Huver elected to be sentenced by the trial court, which assessed punishment at 45 years' confinement. Huver now appeals.

## Legal Sufficiency of the Evidence

In his first issue, Huver contends that legally insufficient evidence supports his conviction. He argues that he presented evidence—namely, his own testimony—that the shooting was an accident, and the jury therefore could not

rationally have found beyond a reasonable doubt that he possessed the necessary mental state for murder.

## A.    Standard of review

We review a challenge to the sufficiency of the evidence under the standard announced in *Jackson v. Virginia*, 443 U.S. 307, 318–20, 99 S. Ct. 2781, 2788–89 (1979). *See Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010). Under the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 317–19, 99 S. Ct. at 2788–89; *Laster v. State*, 275 S.W.3d 512, 517–18 (Tex. Crim. App. 2009). We consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from the evidence in making our determination. *Id.*, *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

The *Jackson* standard defers to the factfinder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. We presume that the factfinder resolved any conflicts in the evidence in favor of the verdict and defer to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793. The jury

may choose to believe or disbelieve any part of any witness's testimony. *See Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Evidence is insufficient when (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, (2) the evidence conclusively establishes a reasonable doubt, or (3) the acts that the State alleges, if true, do not constitute the charged crime. *Kiffe v. State*, 361 S.W.3d 104, 107–08 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see Jackson*, 443 U.S. at 314–19, 99 S. Ct. at 2786–89; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). If an appellate court finds the evidence to be insufficient under this standard, it must reverse the judgment and enter an order of acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 41, 102 S. Ct. 2211, 2218 (1982).

## B. Legally sufficient evidence supports the verdict

The jury saw video showing Huver and his accomplice, Daniel, at the Global Casework facility just before Alex was shot, and additional video of the men fleeing the scene after the shooting. It heard testimony that Huver was jealous of Alex because Alex had contact with Araceli, Huver's wife. It heard Araceli's testimony that Huver told her that he had killed someone and recordings of jail phone calls in which Huver told Araceli, "I did what I did," and expressed no remorse. The jury also heard Huver's own testimony that he pointed a gun at and shot Alex, although Huver testified that the shooting was an accident. He also

testified that he had owned the gun for eight months and fired it on several occasions, indicating some familiarity with its operation. He admitted that he intended to make Alex think that he would be shot. "When a defendant uses a weapon in such a manner that an intent to kill is exhibited, then an intent to kill can be directly concluded." *Moreno v. State*, 755 S.W.2d 866, 869 (Tex. Crim. App. 1988).

We review this evidence in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2789; *Laster*, 275 S.W.3d at 517–18. Applying the *Jackson* standard, we ask whether any rational factfinder could have found Huver guilty of murder beyond a reasonable doubt, deferring to the jury to resolve all discrepancies in the facts. *Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The jury could have believed that the above evidence demonstrated, beyond a reasonable doubt, that Huver intended to murder and did murder Alex. It was free to disbelieve all or any part of Huver's testimony that the shooting was an accident. *Davis*, 177 S.W.3d at 358. Accordingly, we overrule Huver's first issue.[2]

---

[2] Huver suggests in his briefing of his first issue that he was improperly denied an opportunity to obtain an instruction on the doctrine of sudden passion. He concedes, however, that he "failed to present any evidence of sudden passion." He contends that he should have presented such evidence during the punishment phase of his trial but, because he requested punishment by the trial court instead of a jury, he was denied the opportunity to do so. Nothing in the record indicates either that Huver acted in sudden passion regarding information he had known for

**Motion to Suppress**

In his second issue, Huver contends that the trial court erred in denying his motion to suppress his confession to police because he did not make his confession freely and voluntarily and did not knowingly waive his rights. He contends that his question to police—"Is it necessary?"—and the detectives' affirmative answer indicate that he did not understand his rights or voluntarily waive them, and therefore the confession was coerced. He concludes that admission of his confession at trial violated Article 38.22 of the Texas Code of Criminal Procedure, the standard set out in *Miranda*, and constitutional due-process protections.

**A.    Standard of review**

When a defendant challenges a trial court's denial of a motion to suppress a statement, we conduct a bifurcated review, in which we review the trial court's factual findings for an abuse of discretion and its application of law to the facts de novo. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013) (citing *Valtierra v. State*, 310 S.W.3d 442, 447–48 (Tex. Crim. App. 2010)). We grant almost total deference to a trial court's determinations of historical facts. *Valtierra*, 310 S.W.3d at 447. We use the same deferential standard for mixed questions of law and fact that require evaluation of credibility and demeanor. *Id.* However, we review de novo all other mixed questions of law and fact that do not fall within that

---

months or that the trial court, as opposed to Huver's own trial strategy, prevented him from seeking an appropriate instruction on sudden passion.

category. *Id.* We imply all necessary findings of fact that are supported by the record. *Id.* And, we must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

Whether a defendant's statement is voluntary presents a mixed question of law and fact. *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000); *see Juarez v. State*, 409 S.W.3d 156, 164 (Tex. App.—Houston [1st Dist.] 2013, pet. ref d). The State has the burden of proving by a preponderance of the evidence that a defendant has knowingly, intelligently, and voluntarily waived his rights. *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). A defendant need not explicitly waive his rights, nor must he express his waiver in writing. *Id.* A defendant's actions and words may be sufficient to infer waiver. *Id.* When a defendant alleges that he involuntarily waived his rights and made a statement, we consider the totality of the circumstances, including the defendant's experience, background, and conduct. *Leza v. State*, 351 S.W.3d 344, 352 (Tex. Crim. App. 2011); *Joseph*, 309 S.W.3d at 25; *Juarez*, 409 S.W.3d at 165. A statement is involuntary if it was the product of intimidation, coercion, or deception. *Joseph*, 309 S.W.3d at 26; *Juarez*, 409 S.W.3d at 165.

**B. Huver's confession was properly admitted**

Under *Miranda*, the State must advise a person of certain rights before beginning a custodial interrogation. 384 U.S. at 444, 479, 86 S. Ct. at 1612, 1630. Article 38.22 of the Code of Criminal Procedure lists the warnings that must be given in Texas, namely that

> (1) [the person being interrogated] has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2) any statement he makes may be used as evidence against him in court;
>
> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5) he has the right to terminate the interview at any time[.]

TEX. CODE CRIM. PROC. art. 38.22, § 2(a). Once a suspect has been informed of these rights, his statement is admissible if he waives his rights by speaking "freely and voluntarily without any compelling influences." *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630; *see* TEX. CODE CRIM. PROC. art. 38.22, §§ 2–3 (setting out requirements for waiver and additional requirements for recording of statements).

After he was taken into custody, Huver received and acknowledged each of the warnings required by *Miranda* and Article 38.22. He does not dispute that his

15

video-recorded interrogation shows him being given these warnings, one at a time, and acknowledging that he understood each one.

After reading Huver his rights, the interrogating detectives asked, "Knowing all these rights, do you want to talk to us about what happened here?" Huver responded with a question: "Is it necessary?" The detectives said that they "need[ed] to talk to him and get his side of the story," to which Huver responded, "But . . . I don't have any money to pay for an attorney." The detectives confirmed that he understood that he could talk to them without an attorney, then asked again whether Huver "want[ed] to talk to" them. He responded, "Yes," then, without mentioning an attorney again or asking to terminate the interview, spoke with the detectives at length and confessed to intentionally shooting Alex.

We consider Huver's question, "Is it necessary?", in light of the totality of the circumstances including the defendant's experience, background, and conduct. *Leza*, 351 S.W.3d at 352; *Joseph*, 309 S.W.3d at 25; *Juarez*, 409 S.W.3d at 165. In light of that standard, the trial court could reasonably have concluded that the question did not mean that Huver had failed to understand his rights but, rather, was consistent with Huver understanding and voluntarily waiving his rights. As the trial court explained in its written findings of fact, the detectives' response to Huver's question, informing him that they "need[ed] to get his side of the story,"

16

"was not a coercive or deceptive act that would overbear the defendant's ability to intelligently, knowingly, and voluntarily waive his rights."

Moreover, one remark is not dispositive regarding whether a confession was voluntary; it is merely one piece of evidence to be considered. *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996). "The focus is on whether the behavior of the State's law enforcement officials was such as to overbear the will of the accused and bring about a confession not freely determined." *Id.* at 99–100 (citing *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741 (1961)). Applying these standards, we cannot say that the trial court erred in determining that Huver gave his confession freely and voluntarily. *See Turrubiate*, 399 S.W.3d at 150 (appellate court must defer to trial court on issues involving weighing of evidence, credibility, and demeanor in context of motion to suppress).

Huver also argues that translation from Spanish to English during the interview or a lack of mental capacity prevented him from understanding and voluntarily waiving his rights. He does not identify any evidence that any particular translation—whether from Spanish to English or from English to Spanish—was incorrect or caused any failure of understanding, nor does he identify any evidence demonstrating that he suffers from a lack of mental capacity that impaired his ability to understand his rights. Our review of the record reveals the contrary. He clearly and unequivocally stated that he understood each of his

rights, then proceeded to answer the detectives' questions in a clear and coherent manner. Nothing in the record indicates that he was unable to understand what was being said to him regarding his rights or unable to make himself understood regarding his decision to waive those rights.

Finally, Huver argues that the issue of voluntariness should have been submitted to the jury. But the jury was instructed on the law applicable to confessions made while in custody. It was also instructed that, if it had any reasonable doubt regarding whether the detectives read Huver his rights or regarding the voluntariness of Huver's confession, it was not to consider the confession for any purpose. Huver did not object to this portion of the jury charge in the trial court, nor does he identify on appeal any error in the charge.

We hold that the trial court did not err in denying Huver's motion to suppress.[3] Accordingly, we overrule Huver's second issue.[4]

---

[3] We also note that we review even constitutional error, such as a violation of due process under *Miranda*, for harm. TEX. R. APP. P. 44.2(a); *Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011). Huver does not identify any harm that he suffered as a result of the admission of his confession. Overwhelming evidence pointed to his guilt other than the confession, including identifications by multiple eyewitness, his wife's identification of him in surveillance video, his wife's testimony that he confessed to her by telephone, and Huver's own testimony that he intentionally pointed a gun at Castaneda and admission that he fired the gun, despite his claim that he fired the gun by accident. Even if the trial court had erred in admitting the confession and Huver argued that he was harmed by that decision, we would be able "to conclude beyond a reasonable doubt that the trial court's error did not contribute to the appellant's conviction or punishment." *Snowden*, 353 S.W.3d at 818; *see* TEX. R. APP. P. 44.2(a). Accordingly, we would overrule his second issue as harmless.

**Conclusion**

We affirm the conviction.

Harvey Brown
Justice

Panel consists of Justices Massengale, Brown, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).

---

4      Huver also argues that we should abate this appeal for the trial court to make findings of fact supporting its decision on the motion to suppress because no written findings were included in the record. Under Section 6 of Article 38.22, when a trial court determines that a statement was voluntarily given, it "must enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based, which order shall be filed among the papers of the cause." TEX. CODE CRIM. PROC. art. 38.22, § 6. Because the trial court made written findings of fact and conclusions of law supporting its denial of the motion to suppress, which were included in a supplemental clerk's record, we overrule this point as moot.